## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAVID MOORE ET AL.,
  *Plaintiffs*,

  v.                                                    No. 3:21-cv-787 (VAB)

SHAWN SEQUEIRA ET AL.,
  *Defendants.*

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

David Moore, Michael McClain, Daniel Loris, Caroline Moretti, and Roger Falcon

("Plaintiffs") have sued the City of Shelton, Shelton Chief of Police Shawn Sequeira, and

Shelton Mayor Mark Lauretti ("Defendants"). Am. Compl., ECF No. 14.[1] Plaintiffs assert claims

against Chief Sequeira and Mayor Lauretti for deprivation of their First Amendment rights to

free speech, assembly, and association, as well as for defamation, invasion of privacy, and

intentional infliction of emotional distress. *Id.* Plaintiffs also bring claims against the City of

Shelton for retaliation under Connecticut General Statutes section 31-51q and indemnification

under section 7-465. *Id.*

Defendants have filed a motion for summary judgment. Mot. for Summ. J., ECF No. 42

("Mot.").

For the following reasons, Defendants' motion for summary judgment is **GRANTED in**

**part** and **DENIED in part**.

Defendants' motion is denied as to Plaintiffs' First Amendment retaliation claims and

Plaintiffs' retaliation claim under Connecticut General Statutes section 31-51q.

---

[1] Plaintiff John Napoleone agreed to voluntarily dismiss his claims against Defendants and has been terminated from this action. *See* Order, ECF No. 72 (granting motion to dismiss).

Defendants' motion is also denied as to Plaintiffs' defamation and false light claims, although Plaintiffs may not rely on certain statements in support of these claims because they are privileged or because they are non-actionable opinions.

Defendants' motion is granted as to Plaintiffs' intentional infliction of emotional distress claim.

Defendants' motion is denied as to Plaintiffs' indemnification claim.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[2]

At all relevant times up until their terminations, Plaintiffs were police officers employed by the City of Shelton. Am. Compl. ¶ 1. The Shelton Police Union (the "Union") is the exclusive bargaining representative for officers in the Shelton Police Department (the "Department"), and Plaintiffs were members or officers of the Union. Pls.' L.R. 56(a)2 Statement of Facts ¶ 2, ECF No. 64-1 ("Pls.' SMF"); Mem. of Law in Supp. of Mot. for Summ. J. at 2–3, ECF No. 42-1 ("Mem."); Am. Compl. ¶¶ 5, 51, 71, 91, 111.[3]

In June 2019, Officers McClain and Napoleone were directed by a dispatcher to go to a residence on Canal Street in Shelton based on a report of a woman screaming. McClain Decl. ¶ 9, ECF No. 65-17. After arriving at the residence, the officers knocked on the door repeatedly

---

[2] For all facts other than those that are undisputed by the parties, the Court "construe[s] the evidence in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013).

[3] Local Rule 56(a)2(ii) requires the party opposing summary judgment to submit with its Local Rule 56(a)2 statement "a separate section entitled 'Additional Material Facts' setting forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 any additional facts, not previously set forth in responding to the movant's Local Rule 56(a)1 Statement, that the party opposing summary judgment contends establish genuine issues of material fact precluding judgment." While Plaintiffs' Local Rule 56(a)2 statement contains a section titled "Additional Material Facts," this section does not set forth specific facts, but rather conclusory statements of legal issues that Plaintiffs contend are in dispute. Furthermore, each paragraph in this section cites to multiple entire exhibits, rather than to specific paragraphs, as required by Local Rule 56(a)3.

but did not make contact with the inhabitants and eventually left the residence. *Id.* ¶¶ 10–12. About three weeks later, Chief Sequeira learned that the Shelton Police Department had arrested a Bridgeport police officer who lived at the Canal Street residence. Pls.' SMF ¶ 3. A victim had reported a sexual assault that occurred the night that Officers McClain and Napoleone were called to the residence, shortly after the two officers had left. *Id.* Lieutenant Moore was assigned to conduct an Internal Affairs investigation of the Department's handling of the Canal Street call. *Id.* ¶ 5.

In November 2019, after reviewing Lieutenant Moore's report, Chief Sequeira directed Lieutenant Moore to address additional questions based on purported discrepancies in the report. *Id.* ¶ 12. Chief Sequeira received Lieutenant Moore's supplemental report in January 2020. *Id.* ¶ 21.

In March 2020, the Shelton Police Department began implementing safety measures to prevent the spread of COVID-19. *Id.* ¶ 43. As of April 13, 2020, the Department closed the workout rooms and locker rooms at its headquarters and required patrol officers to obtain permission from a supervisor to enter the building. *Id.* Patrol officers objected to this policy. *See* Moore Decl. ¶¶ 29–34, ECF No. 64-6. In their view, changing at home was not a viable option because wearing their uniforms while off duty posed security risks and because officers did not want to risk exposing their families to COVID-19 transmission through their uniforms. *See id.* ¶ 31. As a result, many officers began changing in and out of their uniforms in the Department parking lot. *See id.* ¶ 32.

The day after the closure policy was imposed, Chief Sequeira attended a roll call meeting, where he told officers to stop complaining about the situation. *See* McClain Decl. ¶ 21. He then

warned officers, "you don't want to end up like Dave Moore," and "you don't want to get terminated." *Id.*

On May 14, 2020, Plaintiffs attended a Union meeting at which a Union attorney discussed filing a complaint with the state labor board regarding the closure of the Department headquarters building. *See id.* ¶ 34. The Union attorney asked for attendees' help in documenting officers changing in the parking lot. *See id.* Afterwards, Officer Moretti asked a dispatcher to take a photograph of her changing in the parking lot and sent the pictures to Lieutenant Moore. *See* Moretti Decl. ¶¶ 13–14, ECF No. 65-23. Officer Loris took similar photographs of another officer, his then-girlfriend, Victoria Chapman. *See* Loris Decl. ¶ 9, ECF No. 66. Although Officer Chapman was not aware that she was being photographed at the time, she afterwards consented to sharing the photos with the Union attorney. *See id.* Officer Falcone also took photos of officers changing and of the portable toilets that the Department had set up in the parking lot. *See* Falcone Decl. ¶ 13, ECF No. 66-8.

On June 4, 2020, Lieutenant Moore filed a complaint with the Occupational Safety and Health Administration in his capacity as Union president regarding the closure of the bathrooms and locker rooms. *See* Moore Decl. ¶ 37. On the same day, a Union representative posted photographs of officers changing in the parking lot on a Facebook page titled "Support the Shelton Police Union." *See id.* ¶ 38; Pls.' SMF ¶ 44. After learning of the Facebook post, Chief Sequeira initiated an internal affairs investigation regarding the photographs. *See* Pls.' SMF ¶ 45. Investigators interviewed Officers Moretti, Loris, and Falcone regarding the photographs taken of Officer Moretti and the photographs that Officers Loris and Falcone took of other officers. *See id.* ¶¶ 50–51.

On June 24, 2020, Chief Sequeira appeared at a public rally held at the Department, where he spoke out against Union members and defended the decision to close the headquarters building to patrol officers. *See* Moore Decl. ¶ 68.

On June 25, 2020, Officer Moretti was placed on administrative leave. *See* Moretti Decl. ¶ 22.

On July 2, 2020, Plaintiffs attended a public rally organized by a private citizen to show support for the Union and to protest the closures of the bathrooms and locker rooms. *See* Moore Decl. ¶ 44; McClain Decl. ¶ 26; Moretti Decl. ¶ 23; Loris Decl. ¶ 15; Falcone Decl. ¶ 17. Officer Moore helped organize "Shelton Police Union" t-shirts and spoke at the rally, thanking the attendees for their support of the Union. *See* Moore Decl. ¶¶ 44–45.

Later that same day, Officer Loris and Officer Falcone were placed on administrative leave. *See* Loris Decl. ¶ 16; Falcone Decl. ¶ 18. The day after, July 3, 2020, Officer Moore and Officer McClain were also placed on administrative leave. *See* Moore Decl. ¶ 47; McClain Decl. ¶ 29. Officer Moore was also notified on July 3 that he would be investigated by Internal Affairs regarding his own Internal Affairs investigation into the Department's response to the Canal Street call in June 2019. *See* Moore Decl. ¶ 48.

Sometime after the closure of the bathrooms and before the July 2 rally, Officer Napoleone had a telephone conversation with Chief Sequeira. *See* Ex. K to Moore Decl. at 13–14,[4] ECF No. 64-18 ("Napoleone Dep."). Officer Napoleone viewed Chief Sequeira's remarks as a threat that the Internal Affairs investigation related to the Canal Street incident was "still hanging over" Officer Napoleone. *See id.* at 14. During the same conversation, Chief Sequeira complained about Facebook posts and asked Officer Napoleone to reach out to certain

---

[4] When ECF-generated page numbers differ from internal page numbers, the ECF-generated page numbers are used.

individuals to convince them to take down these Facebook posts. *See id.* at 15. Officer

Napoleone declined to do so. *See id.*

On July 20, 2020, Lieutenant Moore and Officer McClain were terminated. *See id.* ¶ 57.

Lieutenant Moore's termination letter states that he "knowingly and intentionally omitted vital

information from his report," that "untruthful information was discovered in numerous areas of

his investigation," and that his report "was misleading and gave the appearance that you

intentionally compromised the investigation in favor of the two Officers." Ex. V to Moore Decl.

at 1–2, ECF No. 64-29 ("Moore Termination Letter"). Officer McClain's termination letter states

that he failed to properly investigate the reported domestic violence incident on Canal Street in

June 2019 and that he was untruthful and not forthcoming during his Internal Affairs interview,

including by failing to disclose a text message making light of the incident. *See* Ex. E to McClain

Decl. at 2–3, ECF No. 65-22 ("McClain Termination Letter"). Shortly after notifying these

officers of their terminations, Defendants released the termination letters to the press. *See* Pls.'

SMF ¶ 95.

On August 12, Officer Moretti was terminated. *See* Moretti Decl. ¶ 27. The termination

letter states that Officer Moretti staged a photograph of herself in her bra changing in the parking

lot and that Officer Moretti intentionally posted the photograph on a Facebook page supporting

the Union. *See* Ex. C to Moretti Decl. at 1, ECF No. 65-26 ("Moretti Termination Letter"). The

letter also states that Officer Moretti lied twenty-one times during the investigation and that, after

her interview, Officer Moretti contacted the dispatcher who took the photo and asked her to lie to

investigators and to contact a Union attorney to discuss the dispatcher's testimony. *See id.* at 1–2.

On September 4, 2020, Officer Falcone was terminated as well. *See* Falcone Decl. ¶ 24.

Officer Falcone's termination letter stated that he staged the photographs that he took of officers

changing in the parking lot, that these photographs were sexually suggestive and created a hostile work environment, and that Officer Falcone lied about the incident during his Internal Affairs interview. *See* Ex. D to Falcone Decl. at 2–3, ECF No. 66-12 ("Falcone Termination Letter").

Finally, on September 16, 2020, Officer Loris was terminated. *See* Loris Decl. ¶ 29. Officer Loris's termination letter states that he left his patrol shift about an hour early to return to the Shelton Police Department headquarters, where he took a photograph of Officer Chapman while she was changing. *See* Ex. E to Loris Decl. at 2, ECF No. 66-6 ("Loris Termination Letter"). The letter also states that the photograph was staged and that Officer Loris's actions constituted sexual harassment.

As with Lieutenant Moore and Officer Chapman, Officer Moretti's, Officer Falcone's, and Officer Loris's terminations letters were provided to media. *See* Pls.' SMF ¶ 95.

In addition to the release of these termination letters, Defendants made other public statements regarding Plaintiffs' terminations, including quotes given by Mayor Lauretti to the Shelton Herald in an article published on January 22, 2021, and remarks made by Mayor Lauretti to the Shelton Board of Aldermen on April 1, 2021. *See id.*

### B. Procedural History

On June 9, 2021, Plaintiffs filed their Complaint. Compl., ECF No. 1.

On August 5, 2021, Plaintiffs filed an Amended Complaint. Am. Compl.

On August 6, 2021, the Court issued a scheduling order. Scheduling Order, ECF No. 15.

On August 27, 2021, Defendants filed a motion to strike portions of the Amended Complaint. Mot. to Strike, ECF No. 17.

On March 31, 2022, the Court denied the motion to strike. Order, ECF No. 26.

On April 26, 2022, Defendants filed their Answer to the Amended Complaint. Answer, ECF No. 28.

On September 2, 2022, Defendants filed their motion for summary judgment. Mot.

On November 16, 2022, Officer Napoleone filed a motion to voluntarily dismiss his claims against Defendants. Mot. to Dismiss, ECF No. 63.

On November 16, 2022, Plaintiffs filed their opposition to Defendants' motion for summary judgment. Pls.' Opp'n to Summ. J., ECF No. 64 ("Opp'n").

On December 16, 2022, Defendants filed a reply in support of their motion for summary judgment, as well as a response to Plaintiffs' Local Rule 56(a)2 Statement of Facts. Reply in Supp. of Defs.' Mot. for Summ. J., ECF No. 71; Defs.' Resps. to Pls.' Local Rule 56(a)2 Statement of Facts, ECF No. 70.

On June 27, 2023, the Court granted Officer Napoleone's motion to voluntarily dismiss his claims. Order, ECF No. 72.

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed.

R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-01559 (HBF), 2007 WL 685181, at \*7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party on the issue for which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.   DISCUSSION

Defendants seek summary judgment on Plaintiffs' claims for First Amendment retaliation, defamation, invasion of privacy by false light, and intentional infliction of emotional distress.

The Court will address these claims in turn.

### A.  The First Amendment Retaliation Claims

"To survive summary judgment on a First Amendment retaliation claim, a public employee must establish a prima facie case by 'bring[ing] forth evidence showing that [1] he has engaged in protected First Amendment activity, [2] he suffered an adverse employment action, and [3] there was a causal connection between the protected activity and the adverse employment action.'" *Smith v. County of Suffolk*, 776 F.3d 114, 118–19 (2d Cir. 2015) (alterations in original) (quoting *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007)).

A public employee's speech or conduct is protected by the First Amendment when it is "uttered by an employee in his or her capacity as a citizen regarding a matter of public concern." *Id.* (citing *Lane v. Franks*, 573 U.S. 228, 237 (2014)). If a plaintiff's activity is subject to First

Amendment protections, the plaintiff must still show that there was a causal connection between the protected activity and the adverse employment action, i.e., that "the protected speech was a substantial motivating factor in the adverse employment action." *Id.* (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006)). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Id.* (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)). "Since a direct showing requires plaintiff to provide 'tangible proof' of retaliatory animus, 'conclusory assertions of retaliatory motive' are insufficient." *Id.* at 118–19 (quoting *Cobb*, 363 F.3d at 108).

"Even if the plaintiff makes out a prima facie retaliation claim, a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011). The Supreme Court described one such defense in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), holding that a government employer may avoid liability by showing "that it would have reached the same decision as to [the adverse employment action] even in the absence of the protected conduct." *Id.* at 287. An employer may also defend against a prima facie case of retaliation by showing that it "had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Under the *Pickering* balancing test, "defendants may . . . escape liability if they can demonstrate that . . . the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Anemone*, 629 F.3d at 115 (quoting *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006)).

In Counts One and Two, Plaintiffs allege that Chief Sequeira and Mayor Lauretti unlawfully retaliated against them for exercising their rights to freedom of expression and freedom of association under the First Amendment to the United States Constitution. *See* Am. Compl. at 34–36.

Defendants argue that Plaintiffs' alleged associational union activity is not protected because it relates only to internal employment matters rather than issues of public concern. *See* Mem. at 17. They also argue that there is no causal link between any protected activity and Plaintiffs' terminations. *See id.* at 14–15. Defendants contend that the disciplinary processes that led to Plaintiffs' terminations preceded their protected activities. *See id.* at 15. Furthermore, they argue that there can be no causal connection between union membership and their terminations because Plaintiffs were members and officers in the union for years before their termination. *See id.* at 17. Even if there may have been a causal connection, Defendants contend that they are entitled to a *Mount Healthy* defense because they would have terminated Plaintiffs regardless of any protected activity. *See id.* at 16. Finally, Defendants assert a qualified immunity defense, arguing that it was not clearly established that an employee's mere attendance at a rally or support for their union constituted a protected activity under the First Amendment.

In response, Plaintiffs argue that their participation at a public rally that was organized to support the Union constitutes protected speech under the First Amendment. *See* Opp'n at 15. As to the causal connection between their activities and their termination, Plaintiffs contend that Chief Sequeira's own statements show that he viewed the Internal Affairs investigations and the Plaintiffs' Union activity as connected. *See id.* at 17–18. They further argue that the temporal proximity between the Union rally and their suspensions indicates a causal link. *See id.* at 18–20. Plaintiffs also contest Defendants' *Mount Healthy* defense, arguing that Plaintiffs' performance

records did not justify termination. Thus, Plaintiffs contend, Defendants' motion should be denied as to the First Amendment retaliation claims.

The Court agrees.

### 1. Protected First Amendment Activity

Defendants are correct that, other than Lieutenant Moore, none of the Plaintiffs engaged in literal speech. *See* Mem. at 14. Instead, the remaining Plaintiffs base their claims on their support for the Union through their attendance at the July 2 rally and their participation in posting photographs to protest the building closure policy.

Thus, Plaintiffs' activities implicate the "cognate rights" of speech and assembly secured by the First Amendment. *Thomas v. Collins*, 323 U.S. 516, 530 (1945). Because "the same analytical framework applies whether the First Amendment right being exercised is speech . . . or other 'expressive activity' such as assembly," the Court will analyze Plaintiffs' First Amendment claims together. *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017).

The Supreme Court has recognized that activities need not fit "under a narrow, literal conception of freedom of speech, petition or assembly" to receive constitutional protection. *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 430 (1963). Thus, the First Amendment protects "certain forms of orderly group activity." *Id.*

Here, however, Plaintiffs need not rely on the Supreme Court's extension of First Amendment protection to associational activities because Plaintiffs' attendance at the July 2 rally falls squarely within the right to freedom of assembly set forth explicitly in the Amendment. *See Thomas v. Collins*, 323 U.S. 516, 539 (1945) ("[T]he right either of workmen or of unions under [lawful and peaceful] conditions to assemble and discuss their own affairs is as fully protected by the Constitution as the right of businessmen, farmers, educators, political party members or

13

others to assemble and discuss their affairs and to enlist the support of others."); *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("Subject to such reasonable regulation, however, peaceful demonstrations in public places are protected by the First Amendment."); *Collin v. Smith*, 578 F.2d 1197, 1201 (7th Cir. 1978) ("Indeed, an orderly and peaceful demonstration, with placards, in the vicinity of a seat of government, is 'an exercise of (the) basic constitutional rights of (speech, assembly, and petition) in their most pristine and classic form.'" (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963))). The July 2 rally was organized by supporters of the union to protest the Department's building closure policy and seek redress for the officers affected by it. Attendance at this rally constituted an exercise of First Amendment rights "in their most pristine and classic form," regardless of whether Plaintiffs actually spoke at the event. *Edwards*, 372 U.S. at 235.

Plaintiffs' activities also meet the standard for expressive conduct that is entitled to First Amendment protections. *See Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("It is well established that '[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.'" (alteration in original) (quoting *Virginia v. Black*, 538 U.S. 343, 358 (2003))). "To determine whether conduct is expressive and entitled to constitutional protection requires an inquiry into whether the activity is 'sufficiently imbued with the elements of communication to fall within the scope of the First and Fourteenth Amendments' . . . ." *Zalewska v. County of Sullivan*, 316 F.3d 314, 319 (2d Cir. 2003) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). A court must consider "whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Kerik* (alterations in original) (quoting *Johnson*, 491 U.S. at 404).

14

Both Plaintiffs' attendance at the rally and Plaintiffs' participation in the posting of photographs to Facebook were sufficiently communicative to qualify for First Amendment protections. These activities conveyed a clear message in opposition to the building closure policies implemented by the Department and in support of the Union. Defendants, relying on *Cobb v. Pozzi*, contend that an employee's mere association with their union does not touch on a matter of public concern and therefore cannot provide the basis for a First Amendment retaliation claim. *See* Mem. at 17; *Cobb*, 363 F.3d at 107 ("We need not decide today whether [union] membership, by itself, touches on a matter of public concern."). But while mere union membership may not support a freedom of association claim, the Second Circuit has made clear that "union *activities* such as handing out leaflets and distributing a union newsletter satisfied [the] public concern requirement." *Cobb*, 363 F.3d at 107 (emphasis in original) (citing *Clue v. Johnson*, 179 F.3d 57, 59, 61 (2d Cir. 1999)). Here, participation in a union rally and taking or posing in photographs to document Union complaints are both expressive and closely linked with the Union's activities.[5]

Accordingly, Plaintiffs have established that they engaged in protected First Amendment activities.[6]

---

[5] This distinction also undermines Defendants' reliance on *Cobb* in support of their argument that there was no causal connection between Plaintiffs' support for the Union and their terminations because Plaintiffs had been union members for years. *See* Mem. at 17. Plaintiffs' claims are based on the specific actions they took in support of the Union, not merely their membership in the Union.

[6] The Supreme Court clearly established the contours of the rights described above decades before the conduct at issue in this case, and any reasonable official would understand that terminating an employee for engaging in the type of expressive conduct at issue here would violate the First Amendment. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." (citation omitted)). Thus, Defendants are not entitled to summary judgment on their qualified immunity defense.

15

### 2.  Causal Connection

Defendants also argue that there is no evidence showing that Defendants were aware of Plaintiffs' presence at the July 2 rally. Plaintiffs, however, have produced evidence showing that they were visible in news media broadcasts of the rally and that an officer who was close friends with Chief Sequeira was present at the rally directing traffic. *See* Moore Decl. ¶ 46; McClain Decl. ¶¶ 27–28. Thus, there is at least a triable question of fact as to whether Defendants knew that Plaintiffs were at the rally.

Plaintiffs have also produced evidence suggesting that Defendants' decisions to investigate and eventually terminate Plaintiffs were linked to Plaintiffs' criticism of the closure policy. Shortly after the policy was implemented, Chief Sequeira implied at a roll call meeting that officers could be disciplined in the way that Lieutenant Moore had been or could even be terminated if they complained about the closures. *See* McClain Decl. ¶ 21. Officer Napoleone testified at his deposition that he had a telephone conversation with Chief Sequeira where the Chief seemed to threaten Officer Napoleone about the Canal Street incident Internal Affairs investigations "hanging over" him and asked Officer Napoleone to get other officers or their families to take down Facebook posts that were critical of the Department. *See* Napoleone Dep. at 13–16. In a meeting after Officer McClain's termination, Mayor Lauretti told Officer McClain that he was in this position because of the people with whom he associated and that social media was a problem.

While Defendants' statements alone are sufficient to raise a genuine issue of material fact as to the link between Plaintiffs' protected activities and their termination, the temporal proximity between the July 2 rally and Plaintiffs' suspensions and terminations further suggests a retaliatory motive. Officer Loris and Officer Falcone were placed on administrative leave on July

2, after the rally, while Lieutenant Moore and Officer McClain were placed on administrative leave on July 3 and terminated on July 20. *See* Moore Decl. ¶¶ 47, 57. Officers Moretti, Loris, and Falcone were all terminated within the next three months. *See* Moretti Decl. ¶ 27; Loris Decl. ¶ 29; Falcone Decl. ¶ 24.

Defendants argue that this temporal proximity is irrelevant because the disciplinary process had begun before the rally, even if the eventual suspensions and terminations did not occur until afterwards. *See* Reply at 2–3; *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). But Defendants have not produced evidence showing that the disciplinary processes would inevitably have led to termination. Moreover, in the case of Officers Moretti, Loris, and Falcone, the Internal Affairs investigation was started in direct response to the expressive activity of posting photographs on Facebook to criticize the closure policy.[7] Plaintiffs also offer evidence suggesting that the investigation into the Canal Street incident was nearing a favorable completion months before the July 2 rally and that the investigation changed course after the Union began criticizing the closure policy. *See* Napoleone

---

[7] Both parties' briefs focus primarily on the July 2 rally and devote little attention to the Facebook posts, even though they constitute expressive activity and Plaintiffs themselves identify the photographs as a motivating factor in their termination. *See, e.g.*, Loris Decl. ¶ 29 ("The three of us were terminated, as compared to any of the other officers investigated in the "Facebook Incident", because we gave our pictures to the union and attended the rally."). Furthermore, Defendants took pains to disclaim any reliance on the Facebook posts in Plaintiffs' termination letters, perhaps recognizing that these posts might constitute protected activity. *See* Falcone Termination Letter at 4 ("The Facebook postings have no bearing on this investigation nor would it [sic] influence the outcome.").

Defendants may be able to argue under *Pickering* that taking the photographs and posting them on Facebook disrupted the Department's activities and that this disruption outweighed Plaintiffs' First Amendment rights. For example, some of the Plaintiffs' termination letters assert that taking the photographs constituted sexual harassment and that the Plaintiffs' lies about their activities during the Internal Affairs investigation impaired the effectiveness of the Department. *See* Moretti Termination Letter at 2–3; Loris Termination Letter at 3; Falcone Termination Letter at 3. Defendants, however, have not raised such a defense in their motion for summary judgment. Thus, the causal connection between the Facebook posts and Plaintiffs' terminations is relevant to Plaintiffs' retaliation claims.

Dep. at 11 (describing a meeting with Chief Sequeira in which the Chief indicated that Officer Napoleone and Officer McClain did not have "anything to worry about" regarding the Internal Affairs investigation). Although Defendants dispute this evidence, *see* Reply at 4, Plaintiffs have raised a triable issue of fact as to Defendants' motivations in directing the Internal Affairs investigations.

Accordingly, Plaintiffs have raised a genuine dispute of material fact as to the causal connection between their protected activities and their terminations.

### 3. *Mount Healthy* Defense

"Because protected speech could not substantially cause an adverse action if the employer would have taken that action in any event, once the employee has established a prima facie case, the employer may still be entitled to summary judgment based on the Mount Healthy defense by demonstrating by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Anemone*, 629 F.3d at 114 (citations and internal quotation marks omitted). Here, Defendants argue that this defense applies because they would have reached the same decision regarding Plaintiffs' terminations, even if the Plaintiffs had not engaged in protected activity.

In Plaintiffs' termination letters, Defendants identified serious misconduct that could have justified termination. They stated that Officer McClain's failure to properly investigate the Canal Street call resulted in a sexual assault and that Lieutenant Moore tried to cover the incident up. *See* McClain Termination Letter at 2; Moore Termination Letter at 1–2. Officer Moretti was accused of lying repeatedly in her Internal Affairs interview and of encouraging the dispatcher who took the photograph to lie. *See* Moretti Termination Letter at 2. Finally, Officer Loris and Officer Falcone were accused of creating a hostile work environment by taking photographs of

other officers while they were in their underwear. *See* Loris Termination Letter at 3; Falcone

Termination Letter at 2–3.

Even assuming that these asserted non-retaliatory reasons for Plaintiffs' terminations are

supported by the evidence, there remains a genuine issue of material fact as to whether Plaintiffs

would have been terminated for this misconduct regardless of their protected activity. The

evidence of a possible retaliatory motive for Plaintiffs' terminations suggests that the disciplinary

actions may have been less severe if not for Plaintiffs' protected activity. For example, Plaintiffs

point out that the dispatcher who was involved in the Canal Street incident was given only a

thirty-day suspension, Pls.' SMF ¶ 42, and Defendants have not identified any other employees

who were terminated for similar conduct and who did not engage in protected activities.

Considering the evidence in the light most favorable to Plaintiffs, the Court cannot conclude that

Plaintiffs would necessarily have been terminated for the purported misconduct identified in the

termination letters.

Accordingly, Defendants are not entitled to summary judgment on their *Mount Healthy*

defense.

Because Plaintiffs have established a prima facie case of retaliation and Defendants have

not established that any defense applies as a matter of law, Defendants are not entitled to

summary judgment on Plaintiffs' First Amendment retaliation claims.

Accordingly, Defendants' motion will be denied as to these claims. Because Connecticut

General Statutes section 31-51q protects "rights guaranteed by the first amendment to the United

States Constitution," Defendants' motion will also be denied as to Plaintiffs' claim against the

City of Shelton under section 31-51q.

### B.  The Defamation Claim

"To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627–28 (2009) (internal quotation marks omitted).

"If the plaintiff is a public figure, however, the plaintiff also must prove that the defamatory statement was made with actual malice, such that the statement, when made, [was] made with actual knowledge that it was false or with reckless disregard of whether it was false." *Id.* at 628 (alteration in original) (internal quotation marks omitted); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). "Moreover, a public official must prove actual malice by clear and convincing evidence in order to prevail in a defamation action." *Woodcock v. J. Pub. Co.*, 230 Conn. 525, 535 (1994). The Connecticut Supreme Court has held that a police patrol officer is a public official, noting that "a patrolman's office, if abused, has great potential for social harm and thus invites independent interest in the qualifications and performance of the person who holds the position." *Moriarty v. Lippe*, 162 Conn. 371, 378 (1972).

If the plaintiff establishes a prima facie case, the defendant may assert that the communications were protected by either a qualified or an absolute privilege based on a specific public interest that requires the protection of such communications. *See Gambardella*, 291 Conn. at 628; *Kelley v. Bonney*, 221 Conn. 549, 565 (1992). "[A] claim of conditional privilege is defeated if the defendant acts with malice in making the defamatory communication at issue." *Bleich v. Ortiz*, 196 Conn. 498, 504 (1985). On the other hand, an absolute privilege bars

recovery for a defamatory statement "even if it is published falsely and maliciously." *Kelley*, 221 Conn. at 565.

Here, Plaintiffs' defamation claims are based on statements contained in their Termination Letters, the publication of those letters to the media, and other statements made by Chief Sequeira and Mayor Lauretti to the media and to the Shelton Board of Aldermen. *See* Pls.' SMF ¶ 95.

Defendants argue that some of their allegedly defamatory statements are opinions and that others are true. *See* Mem. at 21. They also contend that Plaintiffs have failed to put forward evidence of actual malice by Chief Sequeira or Mayor Lauretti. *See id.* Even assuming that Plaintiffs have established a prima facie case, Defendants assert a defense of absolute privilege for statements made in quasi-judicial proceedings and a defense of qualified privilege for statements made in the bona fide discharge of official duties. *See id.* at 21–24.

Plaintiffs argue in response that Defendants' statements are verifiably false and that Defendants acted with malice because they were aware that their stated rationales for Plaintiffs' terminations were untrue. *See* Opp'n at 41–44. Plaintiffs also contend that Defendants' privilege defenses fail because, even if the termination letters themselves were privileged, Defendants were not required to disclose those letters to the press and because Defendants' statements to the press were made in bad faith. *See id.* at 44–46.

The Court agrees, in part, and disagrees, in part.

### 1.  The Termination Letters

"At common law, 'communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy.'" *Chadha v. Charlotte Hungerford Hosp.*, 272 Conn. 776, 787 (2005) (quoting

*Petyan v. Ellis*, 200 Conn. 243, 245–46 (1986)). "[L]ike the privilege which is generally applied to pertinent statements made in formal judicial proceedings, an absolute privilege also attaches to relevant statements made during administrative proceedings which are 'quasijudicial' in nature." *Kelley*, 221 Conn. at 565–66 (alteration in original) (internal quotation marks omitted). "Once it is determined that a proceeding is quasijudicial in nature, the absolute privilege that is granted to statements made in furtherance of it extends to every step of the proceeding until final disposition." *Id.* at 566 (internal quotation marks omitted).

The Connecticut Supreme Court has concluded that a police department's internal affairs investigation constitutes a quasi-judicial proceeding and, "accordingly, any statements made within the context of that investigation are afforded an absolute privilege." *Craig v. Stafford Const., Inc.*, 271 Conn. 78, 88 (2004). The termination letters were created in the context of the Internal Affairs investigations and represented the "final disposition" of that proceeding.[8]

The Court's inquiry, however, does not end here. "[N]ot all communications relating to [a quasi-judicial proceeding] are necessarily absolutely privileged." *Kelley*, 221 Conn. at 575. "The privilege may be lost by unnecessary or unreasonable publication to one for whom the occasion is not privileged." *Id.* (internal quotation marks omitted). In particular, "unnecessary publication to the news media may result in loss of privilege" because "[t]he salutary policy of allowing freedom of communication in judicial proceedings does not warrant or countenance the dissemination and distribution of defamatory accusations outside of the judicial proceeding." *Id.* at 576 (alteration in original) (internal quotation marks omitted).

---

[8] Defendants point to a Connecticut Superior Court decision purportedly holding that the absolute privilege for quasi-judicial proceedings "extends to any disciplinary letters stemming from an IA investigation." Mem. at 42 (citing *Timbro v. Hertler*, No. CV-04-4002396-S, 2006 WL 1230560, at *4 (Conn. Super. Ct. Apr. 24, 2006)). As Plaintiffs point out, however, the plaintiff in that case failed to produce the writings that formed the basis of his claims, and it is unclear from the court's decision whether those letters included termination letters. Nonetheless, the Court concludes based on the Connecticut Supreme Court's holdings in *Craig* and *Kelley* that termination letters stemming from an internal affairs investigation are entitled to absolute immunity.

But when the media is "independently entitled to view" the published material, the publication is not unreasonable, and the absolute privilege applies. *Id.* (citing *DeLaurentis v. City of New Haven*, 220 Conn. 225, 265–66 (1991)). Thus, because the creation of the termination letters was part of a quasi-judicial proceeding but their publication to the media was not, the "pivotal question here is whether, regardless of the actions of the defendant[s], the media would have been entitled to access" to the termination letters. *Id.* at 576–77.

Defendants argue that the media was entitled to access the letters because they qualify as public records under Connecticut's Freedom of Information Act. *See* Mem. at 23 (citing Conn. Gen. Stat. § 1-210). The Freedom of Information Act generally requires the disclosure, upon request, of "all records maintained or kept on file by any public agency." Conn. Gen. Stat. § 1-210(a).

The Act contains an exception, however, for "[p]ersonnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy." *Id.* § 1-210(b)(2). This provision precludes disclosure when "the information sought by a request does not pertain to legitimate matters of public concern and is highly offensive to a reasonable person." *Dep't of Pub. Safety, Div. of State Police v. Freedom of Info. Comm'n*, 242 Conn. 79, 84 (1997) (emphasis omitted) (quoting *Perkins v. Freedom of Info. Comm'n*, 228 Conn. 158, 175 (1993)).

In applying this exception, Connecticut courts have noted that, "[g]enerally, personnel files are exempt from disclosure as public records under . . . the Freedom of Information Act." *State v. Rodriguez*, 37 Conn. App. 589, 610 (1995). The Connecticut Supreme Court has held that a state's attorney's personnel file, which described "such personal matters as the plaintiff's aptitude, attitude, basic competence . . . trustworthiness, ethics, [and] interpersonal relationships," was exempt from disclosure because its dissemination "would carry significant

potential for embarrassment" and because the employee "entertained a reasonable expectation of privacy in the information contained in the evaluation." *Chairman, Crim. Just. Comm'n v. Freedom of Info. Comm'n*, 217 Conn. 193, 199–200 (1991) (alteration in original).

On the other hand, investigations into misconduct by public officials generally are subject to disclosure. In *Rocque v. Freedom of Information Commission*, 255 Conn. 651 (2001), the Connecticut Supreme Court held that records related to a workplace sexual harassment investigation at a public agency were subject to disclosure because they revealed "the department's efforts to secure the complainant's cooperation, the department's procedure in questioning witnesses and the complainant's concern for job-related consequences from the alleged sexual harassment." *Id.* at 665. The Court excluded from disclosure only the identity and personal details of the complainant, along with portions of the records containing sexually explicit or descriptive information. *See id.*; *see also Dep't of Pub. Safety*, 242 Conn. at 85 (holding that "disclosure of the investigation report exonerating the trooper in the first case from a charge of use of excessive force would not constitute 'an invasion of personal privacy,' but that disclosure of the investigation report exonerating the trooper in the second case from a charge of personal misconduct would constitute 'an invasion of personal privacy'"); *cf. Dir., Ret. & Benefits Servs. Div., Off. of the Comptroller v. Freedom of Info. Comm'n*, 256 Conn. 764, 777 (2001) (noting that a public official's private life "is not a legitimate matter of public concern" when it "does not concern or implicate his job as a public official" (citing *Rocque* and *Department of Public Safety*)).

Based on these precedents, Plaintiffs' termination letters pertain to legitimate matters of public concern and therefore are subject to disclosure under the Freedom of Information Act, even if that disclosure would be highly offensive to a reasonable person. As the Connecticut

Supreme Court noted in determining that a patrol officer is a public figure, "a patrolman's office, if abused, has great potential for social harm and thus invites independent interest in the qualifications and performance of the person who holds the position." *Moriarty*, 162 Conn. at 378. The Court also concluded that a letter to the editor alleging excessive force by a patrol officer involved "an issue of public or general interest sufficient to invoke the New York Times Co. rule." *Id.* at 379 (internal quotation marks omitted).

Furthermore, as in *Rocque*, the termination letters reveal the Shelton Police Department's efforts to investigate misconduct. With respect to Lieutenant Moore and Officer McClain, this investigation purportedly concluded that two officers' failure to investigate a domestic violence incident involving another police officer resulted in a victim being sexually assaulted and that another officer sought to cover up the misconduct. These are issues of legitimate public concern.[9]

Plaintiffs argue that the absolute privilege for quasi-judicial proceedings should not apply because Defendants failed to comply with the Freedom of Information Act's procedural requirements before disclosing Plaintiffs' termination letters. *See* Opp'n at 44–45. The Act requires an agency that receives a request for personnel records to first determine whether it "reasonably believes that the disclosure of such records would legally constitute an invasion of privacy." Conn. Gen. Stat. § 1-214(b)(1). If so, the agency must "immediately notify in writing" the employee concerned and the employee's collective bargaining representative. *Id.* If not, the agency must "first disclose the requested records to the person making the request" and then,

---

[9] Officer Loris's and Officer Falcone's termination letters include the names of the other officers who were purportedly photographed without their consent. This information, like the sexual harassment complainant's name in *Rocque*, likely would be exempted from public disclosure under section 1-210(b). Nonetheless, Plaintiffs' defamation claim does not arise from the unjustified disclosure of these officers' names, and so the inclusion of these names does not affect the privilege analysis.

"within a reasonable time after such disclosure, make a reasonable attempt" to notify the employee concerned. *Id.* § 1-214(b)(2).

Thus, the Act says nothing about notifying an employee about disclosure of records when there is no request. In cases, such as this one, where the records must be disclosed, the Act requires only that the agency attempt to contact the affected employee, and only after first disclosing the records to the requester. The statute confirms that it does not constrain the Department's distribution of the termination letters by providing that "[n]othing in this section shall require an agency to withhold from disclosure the contents of personnel or medical files and similar files when it does not reasonably believe that such disclosure would legally constitute an invasion of personal privacy." *Id.* § 1-214(b)(3).

Accordingly, Defendants' publication of Plaintiffs' termination letters is protected by the absolute privilege that applies to quasi-judicial proceedings.

## 2.  Other Statements

"To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 795 (1999). "A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known." *Goodrich v. Waterbury Republican-Am., Inc.*, 188 Conn. 107, 111 (1982). "An opinion, on the other hand, is a personal comment about another's conduct, qualifications or character that has some basis in fact." *Id.* Even when a statement may appear to be factual, "it remains an opinion if it is clear from the *context* that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated." *Id.* (internal quotation marks omitted).

In their opposition to Defendants' motion, Plaintiffs point to four other purportedly defamatory public statements that Chief Sequeira and Mayor Lauretti made beyond the termination letters themselves.

First, Mayor Lauretti was quoted in the Shelton Herald on July 22, 2020, as saying, "There has been this parochial protectionism inherent in the union mindset [when it comes to policing known law enforcement officers who live in a community]." Ex. 27 to Mot. at 6, ECF No. 66-15 ("July 22 Herald Article").

Second, a Fox 61 article on July 23, 2020, described Chief Sequeira as saying that the officers admitted in their reports to having heard something coming from the apartment and that the officers joked about hearing noises from the apartment that were likely sex acts being performed. Ex. 28 to Mot. at 2, ECF No. 66-16 ("July 23 Fox 61 Article"). The article also quoted Chief Sequeira as saying, "They turned around and cleared it was it was a possible television show." *Id.*

Third, Mayor Lauretti was quoted in a Shelton Herald article on January 22, 2021, as saying that Lieutenant Moore's reelection as union president after his termination gives "the good cops bad names," that "The reason that six cops were terminated is rooted in facts and unacceptable behavior," and that Moore's reelection "undermines the confidence of the public and a standard that promotes good policing." Ex. 30 to Mot., ECF No. 66-18 ("January 22 Herald Article").

Fourth, Mayor Lauretti stated at a Board of Aldermen meeting on April 1, 2021, "We are ensuring that people do their jobs, so that girls don't get raped and supervisors don't cover it up." Ex. 31 to Mot. at 3, ECF No. 66-19 ("Board of Alderman Minutes").

The first statement and some of the third set of statements constitute opinions that are not actionable. Mayor Lauretti's comments regarding a "parochial protectionism inherent in the union mindset" were his characterization of the behavior of police union members. Even if this statement had "some basis in fact," the comment about the "union mindset" does not describe an objective state of affairs that is capable of being known. Similarly, Mayor Lauretti's statements that Lieutenant Moore's reelection gives "the good cops bad names" and "undermines the confidence of the public" are best understood as merely his opinions as to how the union elections reflect on the Department. In context, these remarks are not factual assertions about what particular events cause good cops to have bad reputations. Finally, Mayor Lauretti's statement to the Board of Aldermen implied that Officer Napoleone and Officer McClain, who were identifiable from the context of the remarks, did not "do their jobs" and that Lieutenant Moore covered up their misconduct. The question of whether Officers Napoleone and McClain complied with their duties as patrol officers during the Canal Street incident is a factual one, as is the question of whether Lieutenant Moore facilitated a cover-up.

On the other hand, Chief Sequeira's description of specific actions taken by Officers Napoleone and McClain (second set of statements)[10] and Mayor Lauretti's statement implying that Lieutenant Moore covered up misconduct by Officer Napoleone and Officer McClain (fourth statement) are factual in nature. Mayor Lauretti's statement that "The reason that six cops were terminated is rooted in facts and unacceptable behavior" (third set of statements) is also

---

[10] Chief Sequeira's statement that the officers joked about hearing noises from the apartment that were likely sex acts being performed seems to be based on text messages exchanged between Officer Napoleone, Officer McClain, and a dispatcher. In this conversation, which appears to take place after the officers had left the residence, Officer McClain texted, "They were banging," and the dispatcher responded, "Well their downstairs neighbor was able to hear them no problem. Lol." Pls.' SMF ¶ 27. The Court will deny summary judgment as to this statement by Chief Sequeira; the joking comment "Lol" was made by the dispatcher rather than the officers, and there is little context for Officer McClain's statement that "They were banging." Nonetheless, given the ambiguous nature of this conversation, it may be a challenge at trial to establish that Chief Sequeira's statement was false and that he acted with knowledge or reckless disregard as to its falsity.

factual because it would be false if the officers were instead terminated in retaliation for exercising First Amendment rights. While Defendants argue that this statement is true because an Internal Affairs investigation led to the termination of Lieutenant Moore and Officer McClain, Mem. at 21, there is at least a triable issue of fact as to whether impermissible retaliatory motives underlay the termination of these officers. *See supra* Part III.A.

Similarly, Defendants cannot show that there is no genuine issue of fact as to whether they acted with actual malice. *See* Mem. at 21. Chief Sequeira and Mayor Lauretti made the decisions to terminate Plaintiffs. If these decisions were based on unlawful retaliatory motives rather than the reasons stated in Plaintiffs' termination letters, Chief Sequeira and Mayor Lauretti would have known that the publicly stated reasons were false. Thus, because there is a genuine issue of material fact as to the First Amendment retaliation claims, there is also a genuine issue of material fact as to whether Defendants acted with actual malice.

This reasoning also precludes summary judgment on Defendants' qualified privilege defense. While these statements were not made in the context of the Internal Affairs investigations and therefore are not entitled to absolute privilege, they may be shielded from defamation liability if they were made "in the bona fide discharge of a public or private duty." *Miles v. Perry*, 11 Conn. App. 584, 594 n.8 (1987) (citing *Flanagan v. McLane*, 87 Conn. 220, 221–22 (1913)). The essential elements of such a defense are "(1) an interest to be upheld, (2) a statement limited in its scope to this purpose, (3) good faith, (4) a proper occasion, and (5) a publication in a proper manner to proper parties only." *Id.* at 595 (citing *Charles Parker Co. v. Silver City Crystal Co.*, 142 Conn. 605, 615 (1955)). But "[e]ven when a legitimate interest is at stake, a claim of conditional privilege is defeated if the defendant acts with malice in making the defamatory communication at issue." *Bleich*, 196 Conn. at 504. Since a trial will be necessary to

determine whether Defendants acted with malice in stating that Plaintiffs were terminated for the reasons given in the termination letters, the Court cannot grant summary judgment as to Defendants' qualified privilege defense.

Accordingly, Plaintiffs' defamation claim may not rely on the statements of opinion identified above, but they may rely on all of the other identified statements, excluding the termination letters themselves.

To summarize, Defendants' motion will be denied as to Plaintiffs' defamation claim, and this claim will proceed to trial. Nonetheless, Plaintiffs may not rely at trial on (1) the publication of the termination letters to media organizations; (2) Mayor Lauretti's statement in the Shelton Herald on July 22, 2020, regarding the "parochial protectionism inherent in the union mindset;" and (3) Mayor Lauretti's statements in the Shelton Herald on January 22, 2021, that Lieutenant Moore's reelection gives "the good cops bad names" and "undermines the confidence of the public."

Plaintiffs may, however, rely on (1) Chief Sequeira's statements in the Fox 61 article on July 23, 2020, that the officers admitted in their reports to having heard something coming from the apartment, that the officers joked about hearing noise from the apartment that were likely sex acts being performed, and that the officers "turned around and cleared it as it was a possible television show;" (2) Chief Sequeira's statement in the Shelton Herald on January 22, 2021, that the officers' terminations were "rooted in facts and unacceptable behavior;" and (3) Mayor Lauretti's statement at a Board of Alderman meeting on April 1, 2021 that "We are ensuring that people do their jobs, so that girls don't get raped and supervisors don't cover it up," which asserted that Officers Napoleone and McClain failed to comply with their obligations as patrol officers and that Lieutenant Moore covered up their misconduct.

### C.  The False Light Claim

To establish a claim for false light invasion of privacy, a plaintiff mush show that "(a) the false light in which [he or she] was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Goodrich*, 188 Conn. at 131 (quoting 3 Restatement (Second) of Torts § 652E). "The essence of a false light privacy claim is that the matter published concerning the plaintiff (1) is not true; and (2) is such a 'major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position.'" *Id.* (first citing 3 Restatement (Second) of Torts § 652E cmt. b; and then quoting 3 Restatement (Second) of Torts § 652E cmt. c).

The absolute and qualified privileges that apply to defamation claims under Connecticut law apply equally to false light claims. *See Alexandru v. Dowd*, 79 Conn. App. 434, 438 (2003) (holding that, because "the defendant was absolutely privileged to publish the allegedly defamatory statements at issue," the defendant was entitled to summary judgment as to the plaintiff's libel, slander, invasion of privacy, and intentional infliction of emotional distress claims); *Belanger v. Swift Transp., Inc.*, 552 F. Supp. 2d 297, 301 (D. Conn. 2008) (noting that the qualified privilege for statements by managers regarding an employee's job performance "would immunize the defendant from liability under both the libel and false light claims"); *MacDermid, Inc. v. Leonetti*, 310 Conn. 616, 628 (2013) ("[B]ecause the privilege protects the *communication,* the nature of the theory [on which the challenge is based] is irrelevant." (emphasis in original) (alterations in original) (internal quotation marks omitted)).

The parties raise largely the same arguments as to the false light claims that they made with respect to the defamation claim.

As with the defamation claim, an absolute privilege applies to Defendants' disclosure of Plaintiffs' termination records to the media. Thus, Plaintiffs' false light claim must rely on Defendants' other statements and disclosures.

Defendants argue that Plaintiffs' claim fails because the officers, as public officials, should have reasonably expected that their personnel records might be disclosed. With respect to public officials, the Connecticut Supreme Court has remarked that there is a "close and compelling" analogy between privacy torts and the statutory exemption for invasion of privacy under section 1-210(b)(2) of the Freedom of Information Act. *See Perkins*, 228 Conn. at 173. In the Freedom of Information Act context, the Connecticut legislature has "determined that disclosures relating to the employees of public agencies are presumptively legitimate matters of public concern." *Id.*

Nonetheless, "the elements of a false light claim do not require that a party disprove that the statements involved a legitimate public concern." *Blue v. Carbonaro*, No. CV-14-6015705-S, 2015 WL 3555294, at *28 (Conn. Super. Ct. May 11, 2015). While the Freedom of Information Act and other aspects of public service may diminish a police officer's expectation of privacy, their right to privacy still protects against gratuitous statements falsely maligning their job performance and professionalism.

At least some of the non-privileged statements discussed above in the context of the defamation claim meet the standard for a false light claim as well. *See* July 23 Fox 61 Article (describing Officer McClain's allegedly improper and embarrassing conduct while responding to

32

the Canal Street call); January 22 Herald article (stating that Plaintiffs were terminated for "unacceptable behavior").

As discussed above, there is a triable question of fact as to whether Defendants had "knowledge of or acted in reckless disregard as to the falsity of the publicized matter." *Goodrich*, 188 Conn. at 131. Consequently, there is also a question of fact as to whether Defendants acted with malice, thereby defeating their asserted qualified privilege. *See Bleich*, 196 Conn. at 504 ("[A] claim of conditional privilege is defeated if the defendant acts with malice in making the defamatory communication at issue.").

Accordingly, Defendants' motion for summary judgment on Plaintiffs' false light claim will be denied.

### D.  The Intentional Infliction of Emotional Distress Claim

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan*, 200 Conn. at 253.

In this case, Defendants argue that the mere fact of termination is insufficient to support a claim for intentional infliction of emotional distress. *See* Mem. at 25. They further contend that, even after incorporating the other offensive conduct alleged by Plaintiffs, their claim does not meet the high bar that Connecticut courts have set for intentional infliction of emotional distress claims in the employment context. *See id.* at 25–28. As with the prior claims, Defendants argue that they are entitled to absolute and qualified privileges for certain statements. *See id.* at 28. To

the extent that Plaintiffs' claims are premised on their termination, Defendants argue that Plaintiffs have not yet exhausted the required grievance procedures. *See id.* at 29.

In response, Plaintiffs argue that their intentional infliction of emotional distress claim is viable because it features an element of public ridicule and a pattern of behavior by Defendants. *See* Opp'n at 49. Plaintiffs argue that Defendants have particularly singled out Lieutenant Moore for harassment, including by holding a rally on June 24, 2020, where Lieutenant Moore was called a racist. *See id.* at 50. Plaintiffs also argue that they are not required to exhaust their grievance remedies because their intentional infliction of emotional distress claim is not inextricably intertwined with their claim under the terms of the bargaining agreement. *See id.* at 50–51. Thus, Plaintiff contends, Defendants' motion must be denied.

The Court disagrees.

As a threshold matter, Defendants' claim of absolute privilege applies, as it did with the defamation and false light claims. *See DeLaurentis v. City of New Haven*, 220 Conn. 225, 265 (1991) (holding that the statements at issue "are absolutely privileged and cannot, in and of themselves, support an action for intentional infliction of emotional distress any more than they could have supported an action for libel"); *MacDermid, Inc.*, 310 Conn. at 628 ("[B]ecause the privilege protects the *communication,* the nature of the theory [on which the challenge is based] is irrelevant."). Thus, any communications by Defendants in the course of the Internal Affairs investigation and the publication of Plaintiffs' termination letters to the media cannot form part of Plaintiffs' intentional infliction of emotional distress claim.

"In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 195 (D. Conn. 2000) (Underhill, J.). "An employer's adverse yet routine employment action,

even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner." *Id.* Furthermore, "insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings do not support a claim for intentional infliction of emotional distress." *Id.* Instead, courts have found liability only when "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Tracy v. New Milford Pub. Sch.*, 101 Conn. App. 560, 569–70 (2007).

In *Appleton v. Board of Education*, 254 Conn. 205 (2000), school district employees made disparaging comments questioning a teacher's ability to read, notified the teacher's daughter that she " had been acting differently" and should take a few days off from work, and called the police to escort the plaintiff out of the school building to her car. *Id.* at 211. The teacher also alleged that she was required to undergo psychiatric evaluations, suspended, and ultimately forced to resign. *Id.* The Court concluded that this conduct did not qualify as extreme and outrageous, even if it "may very well have been distressing and hurtful to the plaintiff." *Id.*; *see also Tracy*, 101 Conn. App. at 567–68 (holding that an employee's allegations that supervisors "harassed, intimidated and defamed him in the workplace and disciplined him without conducting a proper investigation" did not state a claim for intentional infliction of emotional distress").

Here, Defendants' non-privileged conduct does not rise to the extreme level required to establish a claim for intentional infliction of emotional distress. In their opposition, Plaintiffs' point to a handful of disparaging comments made towards Lieutenant Moore, as well as general statements referring the rest of the terminated officers. They have not produced evidence of the

type of pervasive campaigns of harassment or public ridicule that have supported other claims for intentional infliction of emotional distress. *See Knight v. Se. Council on Alcoholism & Drug Dependency*, No. 557182, 2001 WL 1231825, at *4 (Conn. Super. Ct. Sept. 24, 2001) (collecting cases).

Accordingly, the Court will grant Defendants' motion for summary judgment as to Plaintiffs' intentional infliction of emotional distress claim.[11]

### E.  The Indemnification

Defendants argue in their motion for summary judgment that Plaintiffs' claim for indemnification against the City of Shelton fails because Defendants are entitled to summary judgment on all of Plaintiffs' claims against the individual Defendants. *See* Mem. at 32.

Accordingly, because the Court will not grant summary judgment on all of Plaintiffs' claims against the individual Defendants, the Court will deny Defendants' motion for summary judgment as to Plaintiffs' indemnification claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**.

Defendants' motion is denied as to Plaintiffs' First Amendment retaliation claims and retaliation claim under Connecticut General Statutes section 31-51q.

Defendants' motion is also denied as to Plaintiffs' defamation and false light claims, although Plaintiffs may not rely on certain statements in support of these claims because they are privileged or because they are non-actionable opinions.

---

[11] As a result, the Court will not reach Defendants' exhaustion argument.

Defendants' motion is granted as to Plaintiffs' intentional infliction of emotional distress claim.

Defendants' motion is denied as to Plaintiffs' indemnification claim.

**SO ORDERED** at Bridgeport, Connecticut, this 18th day of August, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE