UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID MOORE, JOHN NAPOLEONE, | : | NO.: 3:21-CV-00787-VAB |
| MICHAEL MCCLAIN, ROGER FALCONE, | : | |
| DANIEL LORIS AND CAROLINE MORETTI | : | |
| | : | |
| VS. | : | |
| | : | |
| SHAWN SEQUEIRA, MARK LAURETTI, | : | |
| AND CITY OF SHELTON | : | JUNE 20, 2024 |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT
AS A MATTER OF LAW AND/OR MOTION FOR NEW TRIAL**

The plaintiffs, David Moore, Michael McClain, Roger Falcone, and Daniel Loris, hereby oppose

Defendants' motion for judgment as a matter of law and/or motion for a new trial pursuant to Fed. R.

Civ. P. 50(b) and Fed. R. Civ. P. 59.

I.    **STANDARD OF REVIEW**

"The standard governing a motion for judgment as a matter of law is 'appropriately strict.'"

Vera v. Alstom Power, Inc., 189 F. Sup. 3d 360, 368 (D. Conn. 2016) citing Stubbs v. Dudley, 849 F.2d

83, 85 (2d Cir. 1988). "The motion 'may only be granted if there exists such a complete absence of

evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise

and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair

minded [persons] could not arrive at a verdict against [it].'" Id. citing Wiercinski v. Mangia 57, Inc., 787

F.3d 106, 112 (2d Cir. 2015) (quoting <u>Brady v. Wal—Mart Stores, Inc.</u>, 531 F.3d 127, 133 (2d Cir. 2008)). "The Court must deny the motion 'unless, viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" <u>Id.</u> citing <u>Cobb v. Pozzi</u>, 363 F.3d 89, 101 (2d Cir. 2004) (internal quotation marks omitted). "Moreover, notwithstanding a movant's reliance on trial evidence that favored the movant's version of events, a court considering a Rule 50 motion 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" <u>Jennings v. Town of Stratford</u>, 263 F. Sup. 3d 391, 403 (D. Conn. 2017) citing <u>ING Glob. v. United Parcel Serv. Oasis Supply Corp.</u>, 757 F.3d 92, 97 (2d Cir. 2014). "[T]he same standard that applies to a pretrial motion for summary judgment pursuant to Fed.R.Civ.P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50." <u>This Is Me, Inc. v. Taylor</u>, 157 F.3d 139, 142 (2d Cir. 1998).

A district court may order a new trial under Federal Rule of Civil Procedure 59 if an erroneous evidentiary ruling affected a substantial right of the moving party. <u>Lore v. City of Syracuse</u>, 670 F.3d 127, 155 (2d Cir. 2012) ("[A]n erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected,' as when 'a jury's judgment would be swayed in a material fashion by the error.") (quoting <u>Arlio v. Lively</u>, 474 F.3d 46, 51 (2d Cir. 2007). The standard governing a motion for a new trial is "less stringent" than the standard governing a motion for judgment as a matter of law, in that

1) the court may order a new trial even if there is substantial evidence supporting the jury's verdict, and

(2) the Court may weigh the evidence and need not view it in the light most favorable to the party that

prevailed at trial. Gilead Community Services v. Town of Cromwell, 604 F. Sup. 3d 1, 10-11 (D. Conn.

2022) citing Manley v. AmBase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003).  Still, the Court may only

grant a motion for a new trial "if the jury has reached a seriously erroneous result or [its] verdict is a

miscarriage of justice," or "if substantial errors were made in admitting or excluding evidence."  Id.

citing Stampf v. Long Island R.R. Co., 761 F.3d 192, 202 (2d Cir. 2014) (internal citations and quotation

marks omitted).

## II.    LAW AND ARGUMENT

### A.    THE EVIDENCE AT TRIAL SUPPORTS THE JURORS' VERDICT IN FAVOR OF MICHAEL MCCLAIN'S FIRST AMENDMENT AND CONN. GEN. STAT. § 31-51q CLAIMS AGAINST MARK LAURETTI, SHAWN SEQUEIRA AND CITY OF SHELTON.

The Defendants claim the jury had no basis to render a verdict in favor of Plaintiff Michael

McClain because Defendants denied knowledge of Plaintiff McClain's attendance at the public rally on

July 2, 2020.  As set forth below, the evidence adduced at trial, as well as the summary judgment phase

of this case, established that "it is at least plausible" that Defendants were aware of Plaintiff's protected

first amendment activity and terminated him as a result.  Jimenez v. City of New York, 2024 U.S Dist.

LEXIS 9530, *19 (E.D.N.Y Jan. 18, 2024) citing Odermatt vs. New York City Dep't of Educ., 694 F.

App'x 842, 845 (2d. Cir. 2017).

The jury heard undisputed evidence that in response to the closures of the locker rooms and bathrooms the union requested that its members to document the workplace conditions by taking photographs of officers changing in the parking lot.[1]  Exhibit 1, Trial Transcript 4-3-2024 at pp. 49-50. The pictures taken were then posted to Facebook by Shelton Police Union Business Representative Michael Lewis on June 4, 2020, id. at pp. 55-56, and there were a lot of comments on that post. Id. at pg. 61.  Shortly thereafter, on June 9, 2020, Defendant Sequeira put up his own post on the Shelton Police Department Facebook page stating that he is going to investigate possible indecent exposure.  Id. at pp. 63-64.  In response to that post there were 225 public comments and 57 shares.  Id. at pp. 64-65; Exh. 2, (Trial Exhibit 23a).  In addition, media were reaching out to defendants for comments about the postings.  Exh. 3 (Trial Exhibit 24).

Defendants Lauretti and Sequeira would "meet periodically once or twice a week and talk about things."  Exh. 4, Trial Transcript, 4-10-2024 at pp. 78, lines 22-24. Defendants discussed the Union's Facebook post during a meeting and an investigation started thereafter.  Id. at 79.  Mayor Lauretti testified that Chief Sequeira was concerned about the public response to the Shelton Facebook page.  Id. at pg. 90.  Chief Sequeira, however, told the jury that he never saw the comments.  Exhibit 5, Trial Transcript 4-8-24, 166-67.  The jury did not believe him.

---

[1] Plaintiff McClain does not claim he took any pictures, so his First Amendment activity is attendance at the rally.  However, the uproar that the Facebook post caused, the ensuing actions of Defendants, and finally the Shelton Police Rally, which all four plaintiffs attended, are part and parcel of the evidence at trial that jurors heard and saw that convinced them to find in McClain's favor.

In any case, Chief Sequeira attended his own organized rally on June 15, 2020.  Exh. 1, pg. 66.
During that rally Chief Sequeira spoke with a bullhorn.  Id., line 22-25.  He thanked the 15 or 18
attendees for their support, but stated that he didn't need their support because "these people are
lightweights for me."  Id. at 67, lines 1, 17-21.  He told the listeners that he had the full support of the
Mayor and the Board of Aldermen and that it was the 5% of the officers that tried him on a daily basis.
He stated that his job was secure and the Mayor told him he could stay as long as he wants.  Id. at. 68,
lines1-13.  At no time did Mayor Lauretti even question Chief Sequeira about his conduct during that
rally.  Exh. 5, pg. 187, lines 15-20.  Defendant Lauretti gave Shawn Sequeira his full support.  Exh. 4,
pg, 93.  The jurors in this case certainly could have determined by this testimony that Defendants were
more than just "concerned" with the public exposure they were receiving for closing the locker rooms,
bathrooms, and installing portable toilets in the parking lot.

Thereafter a rally was organized by a constituent to support the Shelton police officers.  Exh. 1,
pg. 68, lines 19-24.  A flyer was posted on a union board in the Shelton police department clearly
indicating that the rally to support the Shelton police officers would take place on July 2, 2020, at 6:00
p.m.  Id. at pp. 69-70.  That flyer was posted by David Moore on June 29th and on June 30th he was
ordered by Chief Sequeira to remove the posting.  Id. at pg. 72.  In addition, Sequeira ordered Moore to
provide lengthy explanations as to how the union was involved and how Moore was involved.

Defendant Sequeira was very interested about the Union's involvement with the rally.  Exh. 5, pp. 184-185.

Defendants never disputed at trial or during summary judgment the fact that Plaintiff McClain attended the rally along with Plaintiffs Moore, Falcone, and Loris.[2]  Based on the foregoing evidence and testimony alone, the jurors could reasonably inferred  that the Defendants knew a rally was being held, that Michael McClain attended that rally, and that Defendants were paying close attention to who was there and what was said on that day.  The jurors did not have to believe the testimony of Defendants Lauretti and Sequeira that they had no knowledge of who attended.

In this case both defendants engaged in behavior repeatedly during the trial that was evasive, edgy, hostile, lacking in candor and lacking in consistency. Jurors could credit or discredit in whole or in part every statement or denial these defendants made. Additional evidence that the jurors considered in rendering their verdict in favor of Michael McClain bears repeating:

McClain testified at trial as follows:

Q.  And so, after that pre-disciplinary conference, did you attend the rally in support of the Shelton Police?
A.  Yes, I did.
Q.  And how many people would you say were in attendance?
A.  A few hundred.

---

[2] Defendants do not claim they were unaware of the attendance at the rally of Plaintiffs Moore, Falcone or Loris.  In fact, Defendants questioned the plaintiffs during trial to identify all Shelton police officers that were in attendance that day, seemingly to argue that not everyone was terminated.  A jury could certainly infer, however, that Defendants only terminated those Shelton police officers that attended the rally for whom they had targeted for firing, including Plaintiff McClain.

Exh. 6, 4-5-2024 Trial Transcript, pg. 155.  According to Plaintiff Moore, who was a speaker at the

rally, there were "Three to 400" people in attendance.  Exh. 1, pg. 75.

In addition to hundreds of people being present at the rally, the event was covered live by Fox 61

News, and Mr. McClain was prominently featured.  His undisputed testimony was as follows:

Q.  Now, was the media present at the Shelton Police rally?
A.  Yes, they were.
Q.  Do you remember which media source?
A.  Fox 61 News.
Q.  Okay.  And that was a live feed?
A.   I believe it was, yes.
Q.  Do you know whether or not – let me ask you this:  Did you ever watch the newscast at a later time?
A.  I did.
Q.  Did you see yourself in it?
A.  Right in the front.

Exh. 6, pp. 156-57.  There was also no dispute that Officer Carlos Vinhais, who has now been promoted

to the high rank of Captain and is a colleague of Defendant Sequeira, was also in attendance at the rally.

Plaintiff McClain testified as follows:

Q.  Did you see any other Shelton police officers in the area?
A.  I did.
Q.  Who did you see?
A.  Carlos Vinhais.
Q.  He's the new captain for the department?
A.  From what I'm told, yes.
Q.  Do you know if they had a close relationship?
A.  I know they both worked at the State Police together and Chief Sequeira hired Carlos Vinhais.

Id. at 156. Captain Vinhais was also present at the Chief's rally just weeks before.  Exh. 1, pg. 67.

Defendants also argued, unsuccessfully at summary judgment and at trial, that Chief Sequeira

was contemplating termination of Plaintiff McClain after his pre-disciplinary hearing on July 2, 2020.

This was Defendants' third attempt at this argument, but the evidence adduced at trial once again

overwhelmingly favored Plaintiff McClain.  As a threshold matter, Defendant Sequeira found no support

from Lieutenant Kozlowsky on this claim:

Q.  Prior to the predisciplinary meeting with Dispatcher Macisco on July 1, 2020, did you have any
conversations with the chief concerning potential discipline for Dispatcher Macisco or Officers McClain
and Napoleone?
A.  If I did, I just don't recall.
Q.  Okay.  So prior to the predisciplinary meetings with Officers McClain and Napoleone but following
the disclosure of the text message and you listening to the recording of the interview, did you have any
discussion with Chief Sequeira concerning potential discipline for Officers Napoleone and McClain?
A.  I don't recall.
Q.  Prior to those predisciplinary meetings on July 2nd of 2020, is it fair to say you had – or you can't
recall any discussions about placing the officers on administrative leave?
A.  I don't remember that.

Exh. 7, 4-4-24 Trial Transcript, pp. 140-141.

Moreover, there is direct evidence that the first time Defendants ever contemplated terminating

Plaintiff McClain was the morning of July 3, 2020.  Lieutenant Kozlowsky testified as follows:

Q.  Lieutenant Kozlowsky, we were talking about the rally was on July 2nd, correct for the police union?
A.  Yes.
Q.  All right.  And then you said you weren't at the police department that night, as far as you
remember?
A.  I don't believe I would have been there that late.
Q.  Okay.  All right.  Lieutenant Kozlowsky, this is an email from you to Shawn Sequeira dated July 3rd
of 2020 at 9:30 in the morning?
A.  Yes.

Q.  Okay.  And it's marked "Confidential."
A.  Yes.
Q.  Is that your marking that it was confidential?
A.  That would have been me.
Q.  All right.  And if we go to the second page of that Exhibit 50, on the top of it, it indicates that this is a press release by Chief ShawnR. Sequeira dated July 3, 2020, correct?
A.  Yes.
Q.  Well, let's – when did Chief Sequeira ask you to do this press release?
A.  I don't remember if it was the chief or somebody saying the Chief wanted it done, but at some point I would have been instructed to draft this.
Q.  And whether it was – the order from the chief might have come directly from him or it might have come through another lieutenant or something like that?
A.  Correct.
Q.  Okay.  And were you given that direction in the morning of July 3rd?
A.  I don't remember.
Q.  Well, were you given it in the evening of July 2nd?
A.  I don't remember.

Exh. 7, pp. 69-71.

Q.  And on the morning after the rally, without any predisciplinary conference or anything else, the chief tells you to draft a press release, correct?
A.  I'm not sure if they had a predisciplinary conference before this or not.
Q.  All right.  But after the rally, the Chief has you draft a press release announcing the termination of Mike McClain, correct?
A.  Yes.

Id. at 74.

The jury rationally concluded that less than 24 hours after Michael McClain attended the rally,

Chief Sequeira for the first time wanted to have him fired.  Sequeira testified emphatically that he had

no authority to terminate anyone and that such decision could only be made by Mayor Lauretti   Exh. 5,

pg. 143.  The jury could rationally infer that any decision to terminate Plaintiff McClain on the morning of July 3rd would have come from both defendants.[3]

The cases cited by Defendants do not stand inapposite to the mere requirement that "it is at least plausible" that Defendants were aware of Plaintiff's protected first amendment activity.  Jimenez v. City of New York, 2024 U.S Dist. LEXIS 9530, *19 (E.D.N.Y Jan. 18, 2024) citing Odermatt vs. New York City Dep't of Educ., 694 F. App'x 842, 845 (2d. Cir. 2017).  Defendants notably do not cite either of those cases or the appropriate standard.  Moreover, the cases cited were all decided on motions to dismiss or for summary judgment, where here, summary judgment was denied and a jury listened to all the evidence, heard and considered all of Defendants' defenses, and found in favor of Plaintiff McClain.

Accordingly, Defendants Motion for Judgment as Matter of Law must be denied as to Plaintiff McClain's First Amendment claim.

**B.    THE EVIDENCE AT TRIAL SUPPORTS THE JURORS' VERDICT IN FAVOR OF  MICHAEL MCCLAIN ON HIS DEFAMATION AND INVASION OF PRIVACY CLAIMS AGAINST DEFENDANT SHAWN SEQUEIRA.**

Judge Learned Hand opined that "although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed

---

[3] Defendants waited to terminate Plaintiff McClain until 18 days later and instead on July 3, 2020, both defendants signed off on a notice of administrative leave and Defendant Sequeira also put McClain on notice of a continued internal affairs investigation, further belying a claim that discipline/termination was going into effect before the rally.  Exhibits 8 and 9, Trial Exhibits 51 and 52.

against him." <u>Dyer v. MacDougall</u>, 201 F.2d 255, **11-12. (2d Cir. 1952).  In <u>Dyer</u>, a case for libel and slander, the defendants each "unequivocally denied the utterance of the slanders attributed to him or her; and Almirall and Mrs. Hope denied that he or she had heard the slanders uttered."  <u>Id.</u> at **2.  This is not what occurred in the instant case.  Defendant Sequeira testified as follows:

Q.  When you say you don't recall something, are we supposed to believe that it didn't happen or your just having a failure of memory?
A.  Just exactly what it means.  I don't recall it.  It may have happened.  It may have not.  I don't recall it.

Exh. 5, pg. 195.

Q. Okay.  Well, were you ever told—did you ever state that the officers admitted in the reports to having heard something coming from the apartment; that the officers joked about hearing noise from the apartment and they were likely having sex acts being performed; that the officers turned around and clear it as a possible television show?
A.  No, I do not recall that at all.

Exhibit 10, April 9, 2024, Trial Transcript, pg. 48

Q.  And just so I'm clear, you're claiming that you didn't speak to the press about my clients.
A.  I don't recall speaking to the press about your clients.

<u>Id.</u> pg. 49

Q.  Okay so there are times that you spoke to the press about these plaintiffs?
A.  I think I was interviewed, but I don't know if –
Q.  Yes or no?
A.  I wouldn't know.

<u>Id.</u> pg. 45.

In <u>Dyer</u>, the Court focused on the fact that the defendants and witnesses all "unequivocally" denied the statements. <u>Dyer</u>, at \*\*2. Here, Defendant Sequeira's own definition of "I don't recall" is that "it may have happened it may have not. I don't recall it." This is far from the unequivocal denials found in <u>Dyer</u>. Even the concurrence by Judge Frank acknowledges this distinction:

> One can imagine a case in which a man would suffer a grave injustice, if it were the invariable rule that a plaintiff can never win a case when (1) he can offer only the oral testimony of the defendant, the one available witness, which is flatly and unswervingly against the plaintiff but (2) the jury (in a jury trial) or the judge (in a judge trial) is thoroughly convinced by that witness' demeanor that he is an unmitigated liar. On that account I would oppose such a rule.

<u>Dyer</u> at \*\*24.

In this case, Defendant Sequeira did not unequivocally deny that he made the statement. By his own definition he told the jury that when he says, "I don't recall," it may have happened. Sequeira also told the jury that he thought he was interviewed, that he doesn't recall, and that he wouldn't know. Indeed, he claimed a failure of recall *at least 30 times* throughout his direct testimony. Witnesses often employ the technique of answering "I don't recall" to avoid incrimination. In response to a different question he stated: I believe they may – they commonly misquote all the time. The press, this is a big issue with the press." Exh. 5, pg. 46, line 5-8. Since Sequeira did not unequivocally deny the statement regarding McClain, it was perfectly reasonable for the jury to disbelieve Sequeira's claimed lack of recall and professed belief that the press is unreliable, and to follow the Court's instructions on assessing a party's credibility from the totality of his testimony, demeanor and all of the other trial evidence. In

assessing the credibility of Sequeira's testimony on this point, **the jury presumably followed the Court's instruction on witness credibility and considered all the factors laid out by the Court:**

> "Was [he] frank, forthright and candid, or evasive or edgy as if hiding something?  How did the witness appear; what was [his] demeanor-that is [his] behavior, manner, and appearance while testifiying?  Often it is not what a person says but how he or she says it that convinces us."  The Court also instructed the jury to consider any bias a witness has or "any interest the witness has in the outcome of the case."  Jury Instructions, pp. 13-14.  Finally, in assessing a witness testimony, the Court instructed the jurors to use their common sense, their good judgment and their own life experiences.

Id. at 14.  Given the foregoing ambiguous testimony by Sequeira on this point, it is easy to see why the jury looked askance at this testimony and considered him "evasive or edgy as if hiding something" ruling in favor of McClain on these claims.

Defendants Motion for Judgment as A Matter of Law should therefore be denied as to Plaintiff McClain's Defamation and False Light Claim.

**C.    THE EVIDENCE AT TRIAL SUPPORTS THE JURY'S VERDICTS IN FAVOR OF DANIEL LORIS AND ROGER FALCONE ON THER DEFAMATION AND INVASION OF PRIVACY CLAIMS AGAINST MARK LAURETTI.**

As is the case with Defendant Sequeira, and the case law cited above, Defendant Lauretti did not "unequivocally" deny that he told the press that the reasons six officers were terminated were rooted in facts and unacceptable behavior.  Dyer at **2.  Rather, he responded: "I could have."  Exh. 4, pp. 114-116.  During his deposition, he also did not deny the statement, and when asked to refresh his recollection, he attempted to explain how the press quoted him as follows:  "No. No.  If you put your

full – your full faith and credit in the news media, then you would probably say yes, but I'm not in that category." Id. at 115.  Defendant Lauretti did not deny making the statement to the press.  Rather, he notably offered the jury the same explanation as Sequeria:  the suggestion that he too was likely "misquoted."  The jury reasonably looked askance at this dubious and convenient dual claim by both defendants and for the same reasons. The jurors did not have to credit it and they rationally did not, concluding instead that it was "more likely true than not true" that Mayor Lauretti did in fact make such a statement.

In finding in favor of the Plaintiffs the jury also decided that Defendant Lauretti acted with malice.  The jury was instructed that plaintiffs must prove "actual malice" to recover.  Cox v. Galazin, 460 F. Supp. 2d 380, 393-94 (D. Conn. 2006) citing In New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964).  The Supreme Court held that there is "actual malice" where a statement is made with knowledge that the statement was false or where it was made with reckless disregard as to its veracity. See also Law Firm of Daniel P. Poster, P.C. v. Turner Broadcasting System, Inc., 844 F.2d 955, 959 n.5 (2d Cir. 1988) ("a public figure plaintiff . . . or private figure plaintiff involved in a matter of public concern . . . has the burden to establish falsity."). The Connecticut Supreme Court has explained that "malice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive." Bleich v. Ortiz, 196 Conn. 498, 504, 493 A.2d 236 (1985).

Defendant Lauretti argues that the jury could not have rationally concluded that he knew his statement was untruthful when he described the terminations of Loris and Falcone as "rooted in facts and unacceptable behavior". Mayor Lauretti is the top-ranking official for the City of Shelton, and he hires "an awful lot of people." Exh. 4, pg.74. As he put it, whenever he makes decisions to terminate "I – look it, before anything requires my signature, there is always a discussion" and "[I] would always review and ask questions." Id. at 98. Defendant Sequeira testified that "I believe [Mayor Lauretti] looked at the IA investigation report, and he had many questions for me. He wanted – we wanted it to be very clear, accurate, detailed, thorough." Exh. 10, pg. 32 lines 11-13. Defendant Lauretti could have prevented the constitutional violations at any stage, but as the verdicts, including the jury's decision to impose punitive damages establish, no matter how unlawful it would be, he was going to terminate the plaintiffs. The jury determined that Lauretti had literally no justification to terminate Loris and Falcone and that sexual harassment was just a trumped up charge added on by Defendants to justify termination.

The jury in this case heard nine days of evidence surrounding the terminations of Plaintiffs Loris and Falcone. The totality of that evidence – testimonial and documentary – yielded a unanimous jury determination that Lauretti's espoused reasons for the terminations were not a mere "misconception" on his part but instead were pretextual, malicious and/or reckless, and were in fact imposed in retaliation for constitutionally protected activity.

Defendants Motion for Judgment as A Matter of Law as to Plaintiff Loris' and Plaintiff Falcone's defamation and false light claims should accordingly be denied.

**D.      EVEN IF THE DEFENDANTS WERE TO PREVAIL ON THEIR MOTION AS IT RELATES TO THE DEFAMATION AND FALSE LIGHT CLAIMS, THE COURT SHOULD NOT REMIT THE COMPENSATORY AWARDS.**

Defendants argue that if judgment is entered in its/their favor as to defamation and invasion of privacy claims the Court can look at the verdict form and with mathematical precision remit the compensatory awards without any consideration of the testimony in the case or any thought to the jurors' rationale.  Plaintiffs submit that contrary to Defendants' position, the jury did not randomly assign the sum of $300,000 as to each of these plaintiffs' defamation and invasion of privacy claims and their awards should stand.

With respect to Plaintiffs, Moore and McClain, the jury did not find in their favor as to defamation or invasion of privacy with respect to Defendant Lauretti's statement to the Board of Alderman.  The other statement made by Defendant Sequeira, and sent to the jury for McClain and Moore, was much more specific to Plaintiff McClain so understandably only McClain received a favorable defamation and invasion of privacy verdict as to Sequeira.  The remaining statement sent to the jury and attributable to all plaintiffs was the statement made by Defendant Lauretti that the six terminations were "rooted in facts and unacceptable behavior."

The plaintiffs' testimony on damages focused primarily on how the terminations affected them emotionally, physically, and reputationally. They described the impact on their lives of the charges brought against them, which framed them as liars, stalkers, sexual harassers who lacked integrity. Other than Loris, they testified that they could not get police work and would never work for the City of Shelton again. All this evidence is an obvious basis for the jury's verdict and awards on plaintiffs First Amendment claims. It would be illogical and contrary to the evidence for the jury to front load damages on the common law torts rather than compensate plaintiffs for the harm suffered because of the terminations.

With respect to Plaintiffs Loris and Falcone, Defendant Lauretti terminated them on contrived charges with no consideration for the harm it would cause. Plaintiff Loris is a model police officer with no disciplinary history. He held a special assignment as a canine officer and was considered very early on to have great potential. Plaintiff Falcone, while having been a disciplined five years earlier, had since that time been a model police officer without any further discipline; indeed, he was assigned by Defendant Sequeira as a Field Training Officer. As the jury ultimately agreed, the charges of sexual harassment were absurd, but scandalous enough in the Defendants' minds to both wreck the reputations of officers who had angered them and to shield them against the public outcry that would ensue if the officers were fired for seemingly vindictive and illegitimate reasons. Both plaintiffs testified with

emotional sincerity that being fired by Mayor Lauretti for sexual harassment was a stigma that would follow them always.

At no time were either of these plaintiffs found by Lieutenant Kozlowsky to have engaged in sexual harassment. Nor, by any objective measure, would any reasonable person believe that. Yet, Lauretti thought it was a "strong basis" for terminating them. Exh. 4, pg. 114. The jury did not credit anything Defendant Lauretti said on this issue. The mayor was a decision-maker, someone who employs a lot of people, and has been the Mayor of Shelton for 33 years. He could have checked his retaliatory animus and declined to impose an occupational death penalty but did not. The jury could rationally attribute more compensatory damages to him as compared to Defendant Sequeira who had no final authority to fire anyone.

As to Plaintiff McClain, again the jury certainly could have found that Defendant Sequeira's actions of refusing to allow any further investigation once the text message was discovered was purposeful and malicious. The jury obviously agreed that Sequeira was not forthcoming about his involvement with the Avalon investigation, and that he purposefully slow-walked it and stalled a conclusion to that matter so it might be used as a weapon if needed. That Sequeira had in the past withheld information from McClain about his being exonerated in a prior incident involving an alleged use of excessive force only underscored Sequeira's propensity to prolong and use Internal Affairs

investigations as a Sword of Damocles over the heads of his subordinates.    Exh. 6, pg. 151, Trial Exh. 47.

Defendants' argument for a remittitur of the compensatory damages award is based on self-serving speculation about the jury's collective thought process.  There was more than ample evidence in the record for the jury to award more compensation to each defendant for the First Amendment violations compared to the damages awarded for defamation

**E.      THE JURY' ASSESSMENT OF PUNITIVE DAMAGES AGAINST THE INDIVIDUAL DEFENDANTS ARE REASONABLE, SUPPORTED BY THE EVIDENCE AND SHOULD NOT BE DISTURBED.**

**1.  The Court Should Deny Defendants' Request To Remit The Punitive Damages Entirely.**

Defendants first argue that the jury could not have found punitive damages at all **because they believed they did what was necessary to ensure the function of the department."**  Defs' Memo. pg. 27. But defendants' disappointment at the jury's rejection of that claim as incredible is hardly a recognized basis to interfere with the jury's assessment.  Defendants' recitation of the trial evidence is moreover blatantly inaccurate.   Defendant Sequeira was hands-on, and deeply - if not suspiciously- involved in controlling the investigations.  The jury determined the Plaintiffs' terminations were based on pretextual and reputation-wrecking accusations of misconduct.  The evidence over nine days overwhelmingly demonstrated that Defendants' actions were reprehensible and committed in callous disregard of the Plaintiffs' constitutional rights.  At no time did either Defendant demonstrate an ounce of remorse for

the variety of injuries caused to these officers.  While there is no need for Plaintiffs to recite the entirety of the testimony and evidence put forth, some facts bear are worth repeating.

It is an uncontested fact that Dispatcher Macisco received a mere 30-day suspension for her utter failure to dispatch all the information to the responding officers and treat the call as one involving domestic violence.  Both Defendants knew she had a history of discipline, including failing to dispatch properly a prior domestic violence incident.  Macisco, however, did not engage in union activity or participate in the Shelton Police rally.  Defendants' actions were intentional and done to injure and violate the rights of plaintiffs with unnecessary harshness and severity.  In the case of Officers Loris and Falcone, Defendants fabricated ridiculous charges of sexual harassment to justify terminating two officers who merely took a photograph of officers changing and gave it to their union as well as attended the rally.  The Defendants were undoubtably aware of lifelong harm that can befall anyone, let alone a law enforcement officer, of being fired from one's employment for sexual harassment.  With respect to Falcone, the claim that he was untruthful in two investigations is just false and the jury again did not believe the Defendants.

At no time throughout the pendency of this case did Mayor Lauretti argue he is less culpable because he was misled or egged on by Chief Sequeira.  That is certainly a strategy that Defendants could have taken three years ago, and no such alternative argument was made to the jury during the defense summations  They are both represented by the same counsel and did not point fingers at one another

during the trial.  Mayor Lauretti told the jury that Chief Sequeira had his support and the support of the

Board of Aldermen Exh. 4, 92-93.  Defendant Lauretti is the top-ranking official for the City of Shelton

and he hires "an awful lot of people."  Id. pg. 74; Whenever he makes decisions to terminate, he "I –

look it, before anything requires my signature, there is always a discussion" and "[I] would always

review and ask questions.  Defendant Sequeira testified that "I believe he looked at the IA investigation

report, and he had many questions for me.  He wanted – we wanted it to be very clear, accurate, detailed,

thorough."  Exh. 10, pg. 32 lines 11-13.   Lauretti claimed to have carefully reviewed the facts,

discussed the matter with the Chief and asked questions, while Chief Sequeira went further, stating that

the Mayor "had many questions for me" and "wanted it to be very clear, accurate, detailed, thorough."

Defendants naturally will not concede the probability that the jury did not accept the notion that Mayor

Lauretti who has served in office for 33 years – and whose approval and signature are required for the

drastic step of firing a police officer – could be easily lured into unconstitutional conduct, deceived by a

Chief with whom he claims a trusting and supportive relationship.

  In each of the four cases, the jury determined that the reasons given for the terminations were

pretextual, and that malice was a driving motivation.  Heeding the Court's charge regarding the twin

purposes of punitive damages – deterrence and punishment – the jury assessed punitive damages in

amounts that can hardly be deemed excessive as a matter of law, and moreover fashioned the amounts in

acceptable proportion to compensatory damages. The awards should therefore not be disturbed or reduced.

### 2. The Court Should Deny Defendants' Request To Reduce The Individual Punitive Damages Awards.

Punitive damages "are given to the plaintiff over and above the full compensation for the injuries for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example." Stampf v. Long Island R. Co., 761 F.3d 192, 209 (2d Cir. 2014). A punitive damages award may "enter the zone of arbitrariness" that violates due process 'only when [i]t can fairly be categorized as grossly excessive." Id. at 568. "In gauging excessiveness, [courts] must keep in mind the purpose of punitive damages:  to punish the defendant and deter him and others from similar conduct in the future." Lee v. Edwards, 101 F.3d 805 (2d Cir. 1996) (internal quotation marks omitted). To determine whether a punitive damages award is reasonable, the Gore factors are well accepted guideposts:  (1) "the degree of reprehensibility" associated with the defendants' actions; (2) "the disparity between the harm or potential harm suffered and the size of the punitive award; and (3) the difference between the remedy in this case and the available civil penalties. BMW v. N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996).

The first guidepost, the reprehensibility of the conduct, is the "most important indicium of the reasonableness of a punitive damages award." Gore, 517 U.S. at 575; State farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003). The Supreme Court has stated that in evaluating the

reprehensibility of the conduct, some factors to consider are whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had a financial vulnerability; the conduct involved repeated actions, or mere accident." State Farm, 538 U.S. at 419.

The evidence presented at trial shows that Defendants, the two highest ranking officials in the City of Shelton, engaged in a concerted and ongoing effort to retaliate against the Plaintiffs for protected First Amendment conduct that they believed embarrassed them in the eyes of the public. When Defendants could not find a rational basis to terminate, they conjured into being additional fabricated charges as a pretext. The termination letters were replete with vile, degrading, and false statements crafted with the ill intent to cause the Plaintiffs the greatest amount of harm, including disabling them from obtaining future employment as law enforcement officers.

Like cases involving intentional discrimination, the harm caused to Plaintiffs amounted to more than "purely economic" injury because Plaintiffs were subjected to a violation of their constitutional rights. See Sooroojballie v. Port Auth. of N.Y. & N.J., 816 F. App'x 536, 549 (2d Cir. 2020) (noting the "relative reprehensibility of intentional discrimination as distinguished from some other forms of purely economic injury" that may manifest in breach of contract cases or the like); Zhang v. Am. Gem Seafoods, Inc., 339, 339 F.3d 1020, 1043-44 (9th Cir. 2003)( "intentional discrimination is a different kind of harm, a serious affront to personal liberty . . . [that] often results in large punitive damage

awards."). Furthermore, while the Defendants claim the jury awarded $1.2 million in punitive damages, that statement misrepresents the verdict. The jury awarded 4 individual plaintiffs the sum of $150,000.00 as to each defendant. The punitive awards in these cases are far from excessive when considered in the proper context.

The second "guidepost" also supports the jury's punitive damages award. Defendants' argument seems to be that the Court should reduce the individual punitive damages awards because, when combined together, the amount is excessive. To begin with, conflating the damages awarded to all the Plaintiffs is not a proper basis on which the Court should analyze the issue of excess. The plaintiffs had separate complaints and were each awarded individual compensatory and punitive awards as to each of the Defendants, including the City of Shelton pursuant to Conn. Gen. Stats. § 31-51q. The Defendants chose to unlawfully terminate five percent of the City's police officers in retaliation for their exercise of constitutional rights, a decision they undoubtedly now regret but they cannot now be heard to complain that the jury treated each plaintiff as an individual with an individual case for damages. Combining their awards for purposes of analysis under BMW of N. Am., Inc. vs. Gore, 517 U.S. 559 (1996) would be unfair.

Furthermore, in this case the Court must still enter judgment as to plaintiffs' claims for lost wages, back and front pay, as well as other compensatory damages including pension benefits, before ruling on the motion for remittitur or new trial. When deciding whether a punitive award is excessive as

compared to a compensatory award, the Court must include the economic damages in tandem with the non-economic damages. Chopra v. GE, 527 F.Supp 2d 230, (D. Conn. 2007) ("plaintiff's harm constitutes his emotional harm and his economic loss as reflected in his front pay and back pay awards); Salitros v. Chrysler Corp., 306 F.3d 562, 576 (8th Cir. 2002) (proper to compare amount of punitive damages to front pay award); Greenbaum v. Svenska Handelsbanken, 67 F.Supp. 2d 228, 270 (S.D.N.Y. 1999) (back pay award in discrimination cases reflects harm where no front pay awarded).

**David Moore**

David Moore was awarded $75,000 in compensatory damages as to Defendant Sequeira and $150,000 in punitive damages. He was awarded $75,000 in compensatory damages as to Defendant Lauretti and $150,000 in punitive damages. Plaintiff Moore also has extensive lost wages which the Court will determine at a later hearing. In any case, contrary to Defendants' claim, Moore's awards for emotional distress as to each defendant is modest by any measure and certainly as compared to Jennings v. Town of Stratford, 263 F.Supp. 3d 391, *42, *45 (D. Conn. 2017) (punitive damages of 1.5 million 50% more than the compensatory damages award of $1 million; however Court upholds punitive award of $500,000.00). Defendants urge the Court to find as a matter of law that the punitive damages cannot exceed the compensatory award and must be equalized, but the cases cited by Defendants do not support that assertion. See Defendants' Memo, pp. 30-31, and cases cited therein.

Even if we are to compare his total punitive award of $300,000 ($200,000 less than the Jennings case) to his total award for compensatory damages of $150,000, plus the lost wages, the punitive award falls well below the compensatory award. There is simply no basis, under any rationale or conflation of the awards, for the Court to determine that punitive damages should be reduced.

Accordingly, the punitive damages awarded to David Moore should not be reduced.

**Michael McClain**

Michael McClain was awarded $390,000 in compensatory damages as to Defendant Sequeira and $150,000 in punitive damages. He was awarded $90,000 in compensatory damages as to Defendant Lauretti and $150,000 in punitive damages. Plaintiff McClain also has extensive lost wages. Even if we were to compare his total punitive award of $300,000 to his total award for compensatory damages of $480,000, plus lost wages of several hundred thousand dollars, the punitive award falls well below what is commonly accepted. See Defendants' Memo, pp. 30-31, and cases cited therein. There is simply no basis, under any rationale or conflation of the awards, for the Court to determine that punitive damages should be reduced.

Accordingly, the punitive damages awarded to Michael McClain should not be reduced.

**Roger Falcone**

Roger Falcone was awarded $90,000 in compensatory damages as to Defendant Sequeira and $150,000 in punitive damages. He was awarded $390,000 in compensatory damages as to Defendant

Lauretti and $150,000 in punitive damages.  Plaintiff Falcone also has extensive lost wages which the Court will determine at a later hearing.  In any case, contrary to Defendants' claim otherwise, Plaintiff Falcone's awards for emotional distress as to each defendant is modest by any measure and certainly as compared to <u>Jennings v. Town of Stratford</u>, 263 F.Supp. 3d 391, *42 (D. Conn. 2017) (punitive damages of 1.5 million 50% more than the compensatory damages award of $1 million).  Defendants urge the Court to find as a matter of law that the punitive damages cannot exceed the compensatory award and must be equalized, but the cases cited by Defendants do not support that bold assertion.  <u>See</u> Defendants' Memo, pp. 30-31, and cases cited therein.

Even if we are to compare his total punitive award of $300,000 to his total award for compensatory damages of $480,000, plus the lost wages, the punitive award falls well below the compensatory award.  There is simply no basis, under any rationale or conflation of the awards, for the Court to determine that punitive damages should be reduced.

Accordingly, the punitive damages awarded to Roger Falcone should not be reduced.

**Daniel Loris**

Daniel Loris was awarded $40,000 in compensatory damages as to Defendant Sequeira and $150,000 in punitive damages.  He was awarded $340,000 in compensatory damages as to Defendant Lauretti and $150,000 in punitive damages.   Loris has suffered less in lost wages than the other plaintiffs.  In any case, contrary to Defendants' claim, Loris's awards for emotional distress as to each

defendant is modest by any measure and certainly as compared to <u>Jennings v. Town of Stratford</u>, 263

F.Supp. 3d 391, *42 (D. Conn. 2017) (punitive damages of 1.5 million 50% more than the compensatory

damages award of $1 million).  Defendants urge the Court to find as a matter of law that the punitive

damages cannot exceed the compensatory award and must be equalized, but the cases cited by

Defendants do not support that bold assertion.  <u>See </u>Defendants' Memo, pp. 30-31, and cases cited

therein.  Rather higher punitive awards as compared to compensatory awards are consistently approved.

<u>Id.</u>

Even if we are to compare his total punitive award of $300,000 to his total award for

compensatory damages of $380,000, plus the lost wages, the punitive award falls well below the

compensatory award.  There is simply no basis, under any rationale or conflation of the awards, for the

Court to determine that punitive damages should be reduced.

Accordingly, the punitive damages awarded to Daniel Loris should not be reduced.


**F.      CONCLUSION**

For all the foregoing reasons, the Plaintiffs respectfully urge the Court to deny the Defendants'

motions.

PLAINTIFFS:  DAVID MOORE, MICHAEL MCCLAIN, ROGER FALCONE AND DANIEL LORIS


By:/s/Michelle N. Holmes
Michelle N. Holmes
Federal Bar Number: ct20014
255 Bank Street, Suite 2A
Waterbury, CT  06702
203-596-1091
203-596-1093(fax)


### CERTIFICATION

This is to certify that on June 20, 2024, a copy of the foregoing Plaintiffs' Opposition to Motion for Judgment and/or New Trial was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ Michelle N. Holmes
Michelle N. Holmes